**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **NICOLE L. RYDER,** | § | |
| | § | |
| *Plaintiff,* | § | **CIVIL ACTION NO. H-14-00726** |
| | § | |
| **v.** | § | |
| | § | |
| **SHELL OIL COMPANY AND SHELL** | § | **JURY** |
| **EXPLORATION & PRODUCTION** | § | |
| **COMPANY,** | § | |
| | § | |
| *Defendants.* | § | |


**<u>DEFENDANTS' MOTION FOR COMPLETE SUMMARY JUDGMENT</u>**

## <u>TABLE OF CONTENTS</u>

**Page**

I.     NATURE AND STAGE OF THE PROCEEDING ................................................. 1

II.    ISSUES TO BE RULED UPON BY THE COURT AND STANDARD OF REVIEW ....... 1

III.   SUMMARY OF THE ARGUMENT ................................................................. 2

IV.    STATEMENT OF SUPPORTING, UNDISPUTED MATERIAL FACTS ...................... 3

    A.   Ryder's Employment History with Shell ................................................. 3

    B.   Shell's New Hire Onboarding Handbook ................................................ 4

    C.   Shell and Ryder Entered into a Retention Agreement on August 1, 2011 ................ 4

    D.   Ryder's Performance Problems and Repeated Failure to Meet Shell's Performance Expectations ...................................................................................... 5

    E.   Ryder's 2012 Year-End Performance Evaluation and Performance  Improvement Plan ............................................................................................... 8

    F.   Ryder's Unscheduled Vacation and Written Warning While on a PIP ...................... 9

    G.   Ryder's Continued Performance Problems and Repeated Failure to Meet Shell's Performance Expectations and Shell's Decision to Terminate Ryder's Employment ...................................................................................... 10

    H.   Shell Requested Ryder to Complete a Medical Certification Form to Support Her Absences on May 8, 9, 29, and 30, 2013 .................................................. 11

    I.   Ryder's Medical Certification Form Failed to Provide Support for Her Absences on May 8, 9, 29, and 30, 2013 .................................................................. 12

    J.   Shell Terminated Ryder for Her Failure to Meet Shell's Performance Expectations 13

V.     ARGUMENT AND AUTHORITIES .............................................................. 14

    A.   Ryder's FMLA Interference Claim Fails as a Matter of Law ................................ 14

    B.   Ryder's Breach of Contract Claim Fails as a Matter of Law ................................ 17

        1.   Ryder was an At-Will Employee and, as Such, Shell Could Terminate Her Employment for Any Reason ........................................................ 17

        2.   Ryder Failed to Meet Shell's Performance Expectations and, as Such, Forfeited her Retention Payment ........................................................ 19

VI.    CONCLUSION ...................................................................................... 20

# **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Arismendiz v. University of Texas at El Paso*,
    536 F. Supp. 2d 710 (W.D. Tex. 2008)................................................16

*Beem v. Providence Health & Services*,
    No. CV-10-0037-JLQ, 2011 WL 4852301 (E.D. Wash. Oct. 13, 2011) ...............................17

*City of Midland v. O'Bryant*,
    18 S.W.3d 209 (Tex. 2000)................................................17

*Comeaux-Bisor v. YMCA of Greater Houston*,
    No. H-06-2836, 2007 WL 3171838 (S.D. Tex. Oct. 26, 2007) ........................................14, 16

*Constantine v. American Airlines Pension Benefit Plan*,
    162 F.Supp. 2d 552 (N.D. Tex. 2001) ................................................17

*Curtis v. Ziff Energy Group, Ltd.*,
    12 S.W.3d 114 (Tex. App.—Houston [14th Dist.] 1999, no pet.).........................................18

*Garcia v. Corpus Christi Independent Sch. Dist.*,
    866 F. Supp. 2d 646 (S.D. Tex. 2011) ................................................20

*Laughlin v. Olszewski*,
    102 F.3d 190 (5th Cir. 1996) ................................................2

*Massey v. Houston Baptist University*,
    902 S.W.2d 81 (Tex. App.—Houston [1st Dist.] 1995, writ denied) .....................................18

*Montgomery County Hosp. Dist. v. Brown*,
    965 S.W.2d 501 (Tex. 1998)................................................18

*Morales v. Info. Referral Res. Assistance, Inc.*,
    No. 13-09-00290-CV, 2011 Tex. App. LEXIS 4059 (Tex. App.—Corpus
    Christi May 26, 2011, no pet.) ................................................18

*Soliz v. Assocs. in Medicine, P.A.*,
    No. H-06-2785, 2007 U.S. Dist. LEXIS 60589 (S.D. Tex. Aug. 17, 2007) .............................2

*White v. Aguirre, Inc.*,
    No. 05-00-00503-CV, 2002 WL 987930 (Tex. App.—Dallas May 15, 2002,
    no pet.) ................................................17

*Wilson v. Noble Drilling Servs., Inc.*,
    No. 10-20129, 2010 WL 5298018 (5th Cir. Dec. 23, 2010)................................................19

**Statutes**

29 U.S.C. § 2612(a)(1)(D) ........................................................................................14

29 U.S.C. § 2613(a)-(b) ...........................................................................................15

29 U.S.C. § 2615(a)(1) .............................................................................................14

**Rules**

Fed. R. Civ. P. 56(c) .................................................................................................1

**Regulations**

29 C.F.R. §§ 825.305(a)-(d)......................................................................................15

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| NICOLE L. RYDER, | § | |
| | § | |
| *Plaintiff,* | § | **CIVIL ACTION NO. H-14-00726** |
| | § | |
| **v.** | § | |
| | § | **JURY** |
| **SHELL OIL COMPANY AND SHELL** | § | |
| **EXPLORATION & PRODUCTION** | § | |
| **COMPANY,** | § | |
| | § | |
| *Defendants.* | § | |

## DEFENDANTS' MOTION FOR COMPLETE SUMMARY JUDGMENT

Defendants Shell Oil Company and Shell Exploration & Production Company (collectively "Shell") file this Motion for Complete Summary Judgment.

## I.      NATURE AND STAGE OF THE PROCEEDING

This case arises out of the employment of Nicole L. Ryder ("Ryder"), a former contracts representative who alleges Shell (1) denied her leave in violation of the Family and Medical Leave Act ("FMLA"), and (2) breached the terms and conditions of her retention agreement by prematurely terminating her employment.  Docket call is May 4, 2015.

## II.      ISSUES TO BE RULED UPON BY THE COURT AND STANDARD OF REVIEW

The Court must decide whether genuine issues of material fact prevent Shell from prevailing on Ryder's FMLA interference and breach of contract claims.

Under Rule 56 of the Federal Rules of Civil Procedure, a court must determine whether "materials in the record, including deposition, documents, electronically stored information, affidavits or declaration, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  FED.

- 1 -

R. CIV. P. 56(c).   A court resolves controversies regarding material facts in favor of the nonmovant "only when there is an actual controversy—that is, when both parties have submitted *evidence* of contradictory facts." *Laughlin v. Olszewski*, 102 F.3d 190, 193 (5th Cir. 1996) (emphasis added).   To defeat a properly supported motion, the nonmovant must present affirmative evidence that goes beyond "conclusory allegations and denials, speculations, improbably inferences, unsubstantiated assertions, and legalistic arguments" that a genuine issue of material fact does exist.   *Soliz v. Assocs. in Medicine, P.A.*, No. H-06-2785, 2007 U.S. Dist. LEXIS 60589, at *6-7 (S.D. Tex. Aug. 17, 2007) (all electronically published cases are attached as Exhibit 1).

## III.   SUMMARY OF THE ARGUMENT

Ryder claims Shell (1) interfered with her FMLA rights when it denied her FMLA leave for absences on May 8, 9, 29, and 30, 2013, and (2) breached a retention agreement when it terminated her employment.

There is no viable FMLA interference claim because Ryder was not entitled to any FMLA leave for the relevant absences.   To prevail on her FMLA interference claim, Ryder must establish an essential element of her claim—that she was entitled to FMLA leave.   Ryder cannot establish that she was entitled to FMLA leave because, despite being aware of the need to provide a medical certification form for her absences to be FMLA qualifying, *Ryder failed to provide one*.[1]   Ryder's failure to provide a medical certification form to support her absences was sufficient grounds for Shell to deny FMLA-protected leave.   Ryder has no competent summary

---

[1]      In fact, on the medical certification form, Ryder's health care provider clearly stated that *Ryder was able to perform her job duties and there was no medical necessity for Ryder to take any intermittent leave*.   Indeed, Ryder admitted that her health care provider did not provide any support for intermittent leave for the absences on May 8, 9, 29, and 30, 2013.

judgment evidence to raise a material fact issue regarding the denial of her FMLA leave and, therefore, cannot establish her claim for interference under the FMLA.

Ryder also cannot establish her breach of contract claim relating to the retention agreement because: (1) it is undisputed that *the retention agreement expressly confirmed that her employment was at-will*; and (2) Ryder failed to meet Shell's performance expectations – a requirement for payment.[2]

## IV.  STATEMENT OF SUPPORTING, UNDISPUTED MATERIAL FACTS[3]

### A.  Ryder's Employment History with Shell

Shell hired Ryder as a land analyst on June 16, 2008.[4]  (Exhibit 2, Ryder Dep. at 12:16-13:14).  Ryder worked as a land analyst until January 1, 2010, when she transferred to a land representative position. (*Id*. at 13:17-22).  Approximately two years later, on January 1, 2012, Ryder transferred to a contracts representative position.   (*Id*. at 15:22-16:24).   In all of these positions, Ryder was responsible for, among other things, drafting contracts.  (*Id*. at 13:23-14:5, 14:22-15:7, 15:25-16:3, 16:6-10).  Shell provided Ryder with extensive training related to her job duties and responsibilities.  (*Id*. at 13:6-8, 14:8-17, 16:4-5).  During her employment with Shell, Ryder primarily reported to Jeffrey Turnbull ("Turnbull") and Dawn Suggs ("Suggs").  (*Id*. at 16:11-25).

---

[2]     Indeed, Ryder admitted that she had an ongoing and documented history of performance problems and, despite repeated opportunities to improve her performance, she failed to meet Shell's performance expectations.

[3]     In support of its Motion for Complete Summary Judgment, Shell relies on Ryder's deposition testimony. Excerpts of this testimony are attached to this Motion as Exhibit 2.  Ryder's deposition testimony is presented for the limited purpose of demonstrating that her allegations are insufficient as a matter of law and that Shell is entitled to complete summary judgment.  In further support of this Motion, Shell also relies on the pleadings on file in this action, the declarations of Dawn Suggs and Kent Abadie attached to this Motion as Exhibit 4, and all other exhibits attached to this Motion, which are incorporated herein by reference.

[4]     Prior to her employment as a land analyst, Ryder interned with Shell in the summer of 2007.  (Exhibit 2, Ryder Dep. at 12:22-13:1).

**B.      Shell's New Hire Onboarding Handbook**

Shell's New Hire Onboarding Handbook ("New Hire Handbook") provides the terms and conditions of employment for Shell employees, including Ryder.   (Exhibit 3, New Hire Handbook).   Shell provided Ryder with a copy of its New Hire Handbook.   (Exhibit 2, Ryder Dep. at 20:18-3).   Shell's performance expectations were clear – Ryder was to, among other things, (1) produce top quality work, (2) report to work on time, (3) request vacation in advance, and (4) notify her supervisor if late or if out due to illness.   (Exhibit 3, New Hire Handbook). Ryder understood Shell's expectations and, as an employee, agreed to comply with them. (Exhibit 2, Ryder Dep. at 21:4-22:14, 22:19-22).   Ryder knew at all times that if she was going to be late to work or away due to illness, she was required to notify her supervisor *prior* to her scheduled starting time and, if requesting vacation, Shell expected her to—at a bare minimum— notify her supervisor at least a day in advance, not the same day as her taking vacation.   (*Id.* at 22:15-18, 23:22-24:3, 25:19-24, 26:2-14, 26:25-27:11).   Ryder understood that failing to comply with Shell's expectations would violate Shell's policies and procedures, for which she could be disciplined or terminated.   (*Id.* at 24:4-12, 26:18-24, 27:12-17).

**C.      Shell and Ryder Entered into a Retention Agreement on August 1, 2011**

On August 1, 2011, Shell and Ryder entered into a "Restricted Cash Agreement to Serve" ("Retention Agreement").   (Exhibit 5, Retention Agreement; Exhibit 2, Ryder Dep. at 28:8-24, 235:14-25).   Shell agreed to pay a cash payment of $60,300 to Ryder, subject to the terms and conditions in the Retention Agreement—in particular, that Ryder remained an employee of Shell and did not fail to meet performance expectations during her employment with Shell.   (Exhibit 5, Retention Agreement 1-3).   Ryder understood and agreed to all the terms and conditions in the

Retention Agreement.  (Exhibit 5, Retention Agreement at 4; Exhibit 2, Ryder Dep. at 236:5-242:14).

### D.     Ryder's Performance Problems and Repeated Failure to Meet Shell's Performance Expectations

Approximately four months after entering into the Retention Agreement, Ryder received her 2011 year-end performance appraisal from Turnbull, the supervisor to whom she reported when she worked as a land representative.  (Exhibit 6, 2011 GPA; Exhibit 2, Ryder Dep. 29:13-31:6).   In the performance appraisal, Ryder received an overall rating of 0.9 and, although Turnbull commented on Ryder's accomplishments, he also noted some performance problems:

> Overall, your performance was not as consistent as either of us would like to see. When you were actively engaged, your performance met and exceeded expectations with limited guidance.  Conversely, at times you were not engaged and your performance suffered.

(Exhibit 6, 2011 GPA at 11; Exhibit 2, Ryder Dep. at 31:7-32:16).  Ryder did not disagree with any of Turnbull's comments and, in fact, admitted that, despite her performance problems as a land representative, Shell provided her with the opportunity to make a lateral move to a contracts representative position under Suggs.  (Exhibit 2, Ryder Dep. at 33:9-34:16).

On January 1, 2012, Ryder transferred to the contracts representative position and began reporting to Suggs.  (*Id*. at 15:22-24).  As a contracts representative, Ryder's normal working hours began at 7:30 a.m.[5]  (*Id*. at 24:13-26:1).   However, while working as a contracts representative, Ryder began displaying an increased pattern of tardiness and absenteeism. (Exhibit 4, Suggs Declaration ¶ 4).   Below are some examples of Ryder's tardiness and absenteeism (although there were others) in 2012:

---

[5]     Ryder's scheduled start time was initially 7:00 a.m. (a start time that she personally selected) and then shifted to 7:30 a.m. (because Ryder repeatedly failed to arrive by 7:00 a.m.).   (Exhibit 4, Suggs Declaration ¶ 3). For purposes of this motion for summary judgment, Shell will assume that Ryder's scheduled start time was 7:30 a.m.

| | |
|---|---|
| February 6, 2012 | Ryder failed to report to work on time because of car problems and failed to notify her supervisor of tardiness prior to her scheduled start time.  Ryder admitted that she violated Shell's policies and procedures.  (Exhibit 7, February 6, 2012 Email; Exhibit 2, Ryder Dep. at 35:9-36:25). |
| April 12, 2012 | Ryder failed to report to work on time and subsequently failed to notify her supervisor that she would be absent from work.  Ryder admitted that she would have violated Shell's policies and procedures if she failed to show up for work.  (Exhibit 7, April 12, 2012 Email; Exhibit 2, Ryder Dep. at 38:7-39:19; Exhibit 8, Attendance Records for 2012). |
| April 20, 2012 | Ryder failed to schedule vacation in advance for "personal business."  Ryder admitted that she violated Shell's policies and procedures.  (Exhibit 7, April 20, 2012 Email; Exhibit 2, Ryder Dep. at 39:20-40:15). |
| April 30, 2012 | Ryder failed to schedule vacation in advance for a vet appointment.  Ryder admitted that she violated Shell's policies and procedures.  (Exhibit 7, April 30, 2012 Email; Exhibit 2, Ryder Dep. at 40:16-41:3). |
| May 17, 2012 | Ryder failed to schedule vacation in advance for getting her husband's car fixed.  Ryder admitted that she violated Shell's policies and procedures.  (Exhibit 7, May 17, 2012 Email; Exhibit 2, Ryder Dep. at 41:4-42:4). |
| June 1, 2012 | Ryder failed to schedule vacation in advance for taking her car to the car dealership.  Ryder admitted that she violated Shell's policies and procedures.  (Exhibit 7, June 1, 2012 Email; Exhibit 2, Ryder Dep. at 42:5-16). |
| June 12, 2012 | Ryder failed to show up to work after a doctor's appointment and failed to notify her supervisor that she would be absent from work.  Ryder admitted that she violated Shell's policies and procedures.  (Exhibit 7, June 12, 2012 Email; Exhibit 2, Ryder Dep. at 42:17-44:1). |
| June 15, 2012 | Ryder failed to schedule vacation in advance for taking care of a "family situation."  Ryder admitted that she violated Shell's policies and procedures.  (Exhibit 7, June 15, 2012 Email; Exhibit 2, Ryder Dep. at 44:2-12). |
| July 5, 2012 | Ryder failed to schedule vacation in advance for a "personal day."  Ryder admitted that she violated Shell's policies and procedures.  (Exhibit 7, July 5, 2012 Email; Exhibit 2, Ryder Dep. at 44:13-45:9). |
| August 23, 2012 | Ryder failed to report to work on time because she forgot her badge at home and failed to notify her supervisor of tardiness prior to her scheduled start time.  Ryder admitted that she violated Shell's policies and procedures.  (Exhibit 7, August 23, 2012 Email; Exhibit 2, Ryder Dep. at 45:10-46:5). |
| September 17, 2012 | Ryder failed to report to work on time because she had a dentist appointment and subsequently failed to notify her supervisor of her |

| | absence from work.  Ryder admitted that she violated Shell's policies and procedures.  (Exhibit 7, September 17, 2012 Email; Exhibit 2, Ryder Dep. at 46:10-47:13). |
|---|---|
| October 5, 2012 | Ryder failed to report to work on time because she had a dentist appointment and failed to notify her supervisor of tardiness prior to her scheduled start time.  Ryder admitted that she violated Shell's policies and procedures.  (Exhibit 7, October 5, 2012 Email; Exhibit 2, Ryder Dep. at 47:14-48:8). |
| November 2, 2012 | Ryder failed to report to work on time because she was not "feeling well" and failed to notify her supervisor of tardiness prior to her scheduled start time.   Ryder admitted that she violated Shell's policies and procedures.   (Exhibit 7, November 2, 2012 Email; Exhibit 2, Ryder Dep. at 49:7-25). |
| November 29, 2012 | Ryder failed to report to work on time because she had a migraine and failed to notify her supervisor of tardiness prior to her scheduled start time.   Ryder admitted that she violated Shell's policies and procedures.  (Exhibit 7, November 29, 2012 Email; Exhibit 2, Ryder Dep. at 50:1-16). |
| November 30, 2012 | Ryder failed to report to work and failed to notify her supervisor of absence from work.  Suggs contacted Ryder's husband who seemed surprised that Ryder had not reported to work or called.   Ryder admitted that she violated Shell's policies and procedures.  (Exhibit 7, November 30, 2012 and December 3, 2012 Emails; Exhibit 2, Ryder Dep. at 50:20-52:23, 53:25-54:8). |
| December 14, 2012 | Ryder failed to schedule vacation in advance for taking her dad and brother to the airport.   Ryder admitted that she violated Shell's policies and procedures.  (Exhibit 7, December 14, 2012 Email; Exhibit 2, Ryder Dep. at 52:24-25). |

Ryder's tardiness and absenteeism prevented her from effectively managing her work load and meeting Shell's performance expectations.  (Exhibit 2, Suggs Declaration ¶ 4).  Suggs repeatedly counseled Ryder for her performance problems throughout 2012.[6]  (Exhibit 2, Ryder Dep. at 56:2-82:3; Exhibit 4, Suggs Declaration ¶ 5).

---

[6]       Suggs held meetings with Ryder—mostly on a weekly basis—to discuss various performance problems exhibited by Ryder.  (Exhibit 2, Ryder Dep. at 56:2-14).  Suggs made handwritten notes that memorialized some of her discussions with Ryder.  (Exhibit 4, Suggs Declaration ¶ 5; Exhibit 9, 2012 Handwritten Notes Regarding Performance Problems).  As indicated by the handwritten notes, these discussions covered topics including, but not limited to, Ryder's failure to meet deadlines, failure to attend meetings, failure to schedule vacation in advance, failure to notify Suggs if late or if absent, and failure to provide status updates on projects.  (Exhibit 9, 2012 Handwritten Notes Regarding Performance Problems; Exhibit 4, Suggs Declaration ¶ 5).  Although Ryder could not recall all of the discussions with Suggs, Ryder admitted that she had no reason to think that Suggs made up the handwritten notes about the discussions with Ryder.  (Exhibit 2, Ryder Dep. at 56:2-82:3).  In addition, Ryder's

**E.      Ryder's 2012 Year-End Performance Evaluation and Performance Improvement Plan**

Based on her performance problems, Ryder received an overall rating of 0.7 on her 2012 year-end performance evaluation.  (Exhibit 4, Suggs Declaration ¶ 6).   In the performance evaluation, Suggs detailed Ryder's performance problems and outlined specific focus areas for the following year.  (*Id*.; Exhibit 11, 2012 GPA at 11-12).  Suggs discussed the performance evaluation with Ryder to make Ryder aware of her performance problems and provide her with an opportunity to improve her performance.  (Exhibit 2, Ryder Dep. at 107:2-113:15).  Ryder admitted that she did not disagree with any of Suggs's comments in the performance evaluation. (*Id*. at 113:16-25).

Shortly after Suggs met with Ryder to discuss the performance evaluation, on January 31, 2013, Suggs placed Ryder on a performance improvement plan ("PIP") in an attempt to assist Ryder in meeting Shell's performance expectations.  (Exhibit 12, PIP April 30, 2013; Exhibit 2, Ryder Dep. at 114:2-10, 115:5-10, 116:2-8; Exhibit 4, Suggs Declaration ¶ 7).  Suggs set an action plan with specific areas for improvement and goals for Ryder to accomplish.  (Exhibit 12, PIP April 30, 2013; Exhibit 2, Ryder Dep. at 123:12-21).  Most—if not all—of what was detailed in the performance evaluation was also captured in the PIP.  (Exhibit 12, PIP April 30, 2013; Exhibit 2, Ryder Dep. at 114:11-18, 118:17-123:11).  Suggs reminded Ryder to report to work on time, schedule vacation in advance, and notify her if Ryder was going to be tardy or absent for any reason.  (Exhibit 12, PIP April 30, 2013; Exhibit 2, Ryder Dep. at 118:17-120:10). Suggs met with Ryder on a periodic basis to assist Ryder in improving her performance. (Exhibit 4, Suggs Declaration ¶ 7; Exhibit 13, PIP with Handwritten Notes; Exhibit 2, Ryder Dep. at 137:3-138:6, 144:10-149:9).  Ryder admitted that she did not disagree with anything in

---

various performance problems are further highlighted in emails between Ryder and Suggs.  (Exhibit 10, 2012 Emails Regarding Performance Problems; Exhibit 2, Ryder Dep. at 85:3-104:23; Exhibit 2, Suggs Declaration ¶ 5).

the PIP.  (Exhibit 2, Ryder Dep. at 115:1-4).  Ryder admitted that, as an employer, Shell could have terminated her employment rather than place her on the PIP to improve her performance. (*Id*. at 115:18-118:10).  Ryder admitted that, if she failed to improve her performance, she could be terminated.  (*Id*. at 123:22-124:3).

### F.    Ryder's Unscheduled Vacation and Written Warning While on a PIP

Despite being on a PIP, Ryder refused to comply with Shell's performance expectations. On April 1, 2013, Ryder emailed Suggs and informed her that she planned to take a vacation day that morning so that she could "pick up the dogs from the vet and take [her] brother to the airport."  (Exhibit 14, April 1, 2013 Email; Exhibit 2, Ryder Dep. at 125:3-18).  Ryder assured Suggs that she would "be in before [the] PHA meeting begins so that [she wouldn't] miss anything scheduled."  (Exhibit 14, April 1, 2013 Email; Exhibit 2, Ryder Dep. at 125:19-126:14). Despite this assurance, Ryder never showed up for work—she missed the scheduled meeting and, in fact, never updated Suggs regarding her absence from work.  (Exhibit 14, April 1, 2013 Email; Exhibit 15, Written Warning; Exhibit 2, Ryder Dep. at 126:15-127:15).  Ryder admitted that this unscheduled vacation violated the PIP and that Shell could have terminated her employment.  (Exhibit 2, Ryder Dep. at 128:3-130:14).

Instead of terminating Ryder—which Shell could have done—on April 3, 2013, Suggs memorialized the unscheduled vacation in a written warning and provided Ryder with another opportunity to improve her performance.  (Exhibit 15, Written Warning; Exhibit 2, Ryder Dep. at 133:2-17; Exhibit 4, Suggs Declaration ¶ 8).  Suggs noted in the written warning that it would remain in effect for eighteen months and that "[a]ny further incidents of job-related problems could result in further formal corrective action possibly up to and including the termination of [her] employment."  (*Id*.).  Ryder understood the significance of the written warning and

admitted that she did not disagree with anything in the written warning.  (Exhibit 2, Ryder Dep. at 131:13-21, 133:20-134:3).  Given that Ryder's PIP was scheduled to end on April 30, 2013, Suggs extended Ryder's PIP to May 31, 2013.  (Exhibit 16, PIP May 31, 2013; Exhibit 4, Suggs Declaration ¶ 8).

**G.    Ryder's Continued Performance Problems and Repeated Failure to Meet Shell's Performance Expectations and Shell's Decision to Terminate Ryder's Employment**

On the heels of her written warning, Ryder continued to display a pattern of tardiness and absenteeism.[7]  (Exhibit 4, Suggs Declaration ¶ 8).  Below are some examples of Ryder's tardiness and absenteeism (although there were others in 2013) after her written warning:

| | |
|---|---|
| May 1, 2013 | Ryder failed to schedule vacation in advance for taking her dog to the vet for an appointment.  Ryder admitted that she violated Shell's policies and procedures.  (Exhibit 18, May 1, 2013 Email; Exhibit 2, Ryder Dep. at 145:10-146:19). |
| May 8, 2013 | Ryder failed to report to work because she was "feeling very under the weather."  (Exhibit 19, May 8, 2013 Email). |
| May 9, 2013 | Ryder failed to report to work because she was "not feeling any better today."  (Exhibit 19, May 9, 2013 Email). |
| May 29, 2013 | Ryder failed to report to work because she was "up all night sick." (Exhibit 19, May 29, 2013 Email). |
| May 30, 2013 | Ryder failed to report to work because she had not "gotten any better since yesterday" and failed to notify her supervisor of her absence prior to her scheduled start time.  (Exhibit 19, May 30, 2013 Email). |
| June 10, 2013 | Ryder failed to schedule vacation in advance for picking up her dog from the vet.  Ryder admitted that she violated Shell's policies and procedures.  (Exhibit 20, June 10, 2013 Email; Exhibit 2, Ryder Dep. at 157:19-161:12). |
| June 27, 2013 | Ryder failed to schedule vacation in advance for taking her dog to the vet.  Ryder admitted that she violated Shell's policies and procedures. (Exhibit 20, June 27, 2013 Email; Exhibit 2, Ryder Dep. at 159:11-161:12). |

---

[7]      Ryder also exhibit various performance problems, including poor quality of work.  (Exhibit 21, 2013 Performance Problems; Exhibit 2, Suggs Declaration ¶ 9).  For example, Ryder misdated documents and copied the wrong employee on email communications.  (Exhibit 21, 2013 Performance Problems;  Exhibit 2, Ryder Dep. at 161:16-166:15).

On May 28, 2013—*well before Ms. Ryder's request for FMLA leave for her absences on May 8, 9, 29, and 30, 2013*—Suggs reached out to HR Account Manager Jennifer Grounds ("Grounds") to discuss the status of Ryder's PIP and next steps in light of Ryder's continued failure to improve her performance.  (Exhibit 22, May 28, 2013 Email; Exhibit 4, Suggs Declaration ¶ 9).  Suggs met with Grounds on May 30, 2013 and outlined Ryder's performance problems.  (Exhibit 22, May 30, 2013 Email; Exhibit 4, Suggs Declaration ¶ 9).  The final meeting to inform Ryder of the outcome of the PIP was initially scheduled for June 12, 2013 and then finally took place on July 8, 2013.  (Exhibit 4, Suggs Declaration ¶ 9).

**H.    Shell Requested Ryder to Complete a Medical Certification Form to Support Her Absences on May 8, 9, 29, and 30, 2013**[8]

On June 13, 2013—*for the first time*—Ryder informed Grounds (and only Grounds) of her pregnancy and specifically asked Grounds not to tell Suggs of her pregnancy.  (Exhibit 17, June 13, 2013 Email; Exhibit 2, Ryder Dep. at 148:15-149:20).  Ryder claimed that her absences on May 8, 9, 29, and 30, 2013 were due to morning sickness.  (Exhibit 17, June 13, 2013 Email).

On June 14, 2013, after congratulating Ryder and providing her with information related to Shell's maternity leave policy, Grounds asked (and, in fact, encouraged) Ryder to submit a medical certification form to support her absences on May 8, 9, 29, and 30, 2013 under the FMLA.  (Exhibit 17, June 14, 2013 Email; Exhibit 2, Ryder Dep. at 149:21-157:14, 169:13-25, 191:22-192:11).   Grounds also directed Ryder to the Reed Group, Shell's third party leave administrator, to initiate her request for FMLA leave and advised Ryder that she must get the medical certification form submitted for her absences on May 8, 9, 29, and 30, 2013.  (Exhibit

---

[8]      Shell's FMLA policy requires an employee to provide a medical certification form from a health care provider to support the need for FMLA leave.  The FMLA policy expressly states that the failure to provide the required documentation may result in the denial of FMLA coverage.  (Exhibit 23, FMLA Policy).  Ryder admitted that she was aware of Shell's FMLA policy and that the failure to submit a complete and accurate medical certification form could result in the denial of FMLA leave.  (Exhibit 2, Ryder Dep. at 189:24-191:19).

17, June 14, 2013 Email; Exhibit 2, Ryder Dep. at 149:21-157:14).  On June 18, 2013, Grounds, once again, reminded Ryder to provide the medical certification form for her absences on the May 8, 9, 29, and 30, 2013.  (Exhibit 17, June 18, 2013 Email; Exhibit 2, Ryder Dep. at 149:21-157:14).

> ### I.      Ryder's Medical Certification Form Failed to Provide Support for Her Absences on May 8, 9, 29, and 30, 2013

Despite being aware of the need to submit a medical certification form, Ryder waited twelve days—until June 26, 2013—to contact Reed Group, at which point Ryder received the FMLA paperwork from Reed Group.  (Exhibit 24, Reed Group Medical Records at 11, 20-31; Exhibit 2, Ryder Dep. at 197:17-198:6, 201:11-202:2, 203:13-204:14).  The FMLA paperwork, once again, advised Ryder of her rights and responsibilities under the FMLA—and, most importantly, that the failure to provide a timely, complete, and sufficient medical certification could result in the denial of her FMLA leave—all of which Ryder understood.  (Exhibit 24, Reed Group Medical Records at 11, 20-31; Exhibit __, Ryder Dep. at 198:16-200:9, 202:20-203:10, 205:14-23, 209:20-210:4).

Ryder completed her portion of the FMLA paperwork.  (Exhibit 24, Reed Group Medical Records at 13).  However, as reproduced, in pertinent part, below, Ryder did not indicate anywhere that she needed intermittent leave for the absences on May 8, 9, 29, and 30, 2013:

> Please specify the period of time during which you are requiring any sort of leave:
> From ____/____/____ through ____/____/____
>
> Will you require intermittent leave? ☐ Yes ☐ No   | Anticipated Return to Work
> Date:  ____/____/____

(*Id*.; Exhibit 2, Ryder Dep. at 207:4-208:1).  On June 27, 2013, Ryder met with her health care provider (Dr. Lisa Beard), informed Dr. Beard of the need to support intermittent leave for the absences on May 8, 9, 29, and 30, 2013, and provided Dr. Beard with the FMLA paperwork.

(Exhibit 2, Ryder Dep. at 202:3-19, 204:15-205:8).  However, Dr. Beard refused to support any intermittent leave for the absences on May 8, 9, 29, and 30, 2013.  (Exhibit 24, Reed Group Medical Records at 14-16).  In fact, as indicated on the medical certification form, Dr. Beard believed that there were no complications with Ryder's pregnancy, Ryder was able to perform her job duties prior to delivery, and there was no medical necessity for Ryder to take any intermittent leave prior to delivery—and, as such, Dr. Beard only supported *continuous leave after Ryder's delivery* from January 3, 2014 to February 17, 2014.  (*Id*.; see also Exhibit 2, Ryder Dep. at 210:9-25, 211:22-214:1).  Although Reed Group contacted Ryder to obtain another medical certification form to support intermittent leave for the absences on May 8, 9, 29, and 30, 2013, Ryder never submitted any additional FMLA paperwork to Reed Group.  (Exhibit 24, Reed Group Medical Records at 32-37).  When Reed Group contacted Dr. Beard, Dr. Beard confirmed that she only supported FMLA leave after Ryder's delivery.  (*Id*. at 10).

**J.**    **Shell Terminated Ryder for Her Failure to Meet Shell's Performance Expectations**

On July 8, 2013, Kent Abadie (Suggs's manager), Suggs, and HR Account Manager Christine Layne ("Layne")[9] met with Ryder to inform her of her termination.  (Exhibit 2, Ryder Dep. at 167:10-22).  In preparation for the termination meeting, Suggs prepared discussion points outlining Ryder's performance problems—for example, Suggs focused on Ryder's failure to meet the minimum expectations set forth in her 2012 performance evaluation, Ryder's failure to improve her performance as required under the PIP, the written warning that Ryder received while on a PIP, and Ryder's continued failure to improve her performance and its impact on the company.[10]  (Exhibit 25, Discussion Points for Termination Meeting; Exhibit 26, July 8, 2013

---

[9]    Layne attended the termination meeting to substitute for Grounds, who was out of the office at the time.
[10]    On July 8, 2013, Suggs sent an email to Abadie that set forth the discussion points for the termination meeting.  (Exhibit 26, July 8, 2013 Email).  Suggs's discussion points were subsequently revised to state that the

Email; Exhibit 4, Suggs Declaration at ¶ 10).  Shell accordingly terminated Ryder's employment due to her failure to meet Shell's performance expectations.[11]   (Exhibit 4, Suggs Declaration ¶ 10; Exhibit 4, Abadie Declaration ¶ 3).  At the time of her termination, Ryder had not provided a medical certification form to support intermittent leave for the absences on May 8, 9, 29, and 30, 2013.  (Exhibit 24, Reed Group Medical Records at 13-16).

## V.   ARGUMENT AND AUTHORITIES

### A.   Ryder's FMLA Interference Claim Fails as a Matter of Law

Under the FMLA, an eligible employee is entitled to twelve weeks of unpaid leave during any twelve-month period for a serious health condition that makes the employee unable to perform the functions of his or her position.  *See* 29 U.S.C. § 2612(a)(1)(D).  The FMLA makes it unlawful for an employer to interfere with, restrain, or deny an employee's FMLA rights.  29 U.S.C. § 2615(a)(1).  Ryder alleges that Shell interfered with her FMLA rights when it denied her FMLA leave for her absences on May 8, 9, 29, and 30, 2013.

To prevail on her FMLA interference claim, Ryder must establish:  (1) she is an eligible employee under the FMLA; (2) Shell is an employer subject to FMLA requirements; (3) she was entitled to FMLA leave; (4) she gave notice to Shell of her intention to take FMLA leave, and (5) Shell denied the FMLA leave to which she was entitled.  *See Comeaux-Bisor v. YMCA of Greater Houston*, No. H-06-2836, 2007 WL 3171838, at *4 (S.D. Tex. Oct. 26, 2007).

---

decision to terminate Ryder was not based on absences covered by a medical certification form but rather the unexcused absences not covered by a medical certification form.  (Exhibit 25, Discussion Points for Termination Meeting).  Although Ryder disputed what was stated in the termination meeting, Ryder admitted that Suggs is an honest person, does not know why she (or Abadie or Layne) would make up what was outlined in the email to Abadie, and does not disagree with any of the discussion points with the exception of two items—"Poor quality, incomplete work." and "Great White PHA."  (Exhibit 2, Ryder Dep. at 20:2-16, 174:12-176:15).

[11]     Notwithstanding her absences on May 8, 9, 29, and 30, 2013, Ryder repeatedly failed to meet Shell's performance expectations during her employment with Shell.  Indeed, even after her written warning—in which Shell warned her that any further incidents could result in termination—Ryder failed to comply with Shell's performance expectations on May 1, June 10, and June 27, 2013 and, in fact, at her deposition, Ryder admitted that she failed to comply with Shell's performance expectations.  (Exhibit 2, Ryder Dep. at 145:10-146:19, 157:18-161:13).

Ryder cannot establish the third and fifth prongs of her FMLA interference claim because Ryder was not entitled to FMLA leave.

Under the FMLA, an employer, such as Shell, has the right to ask for a medical certification form from a health care provider before granting FMLA leave. 29 U.S.C. § 2613(a)-(b); 29 C.F.R. § 825.305(a)-(e). Once the employer exercises this right, the request for a medical certification form becomes a requirement with which the employee must comply. *Id*. If the employee fails to provide a medical certification form, then the leave is not FMLA leave. *Id*.

On June 14, 2013, Grounds asked Ryder to provide a medical certification form to support her absences on May 8, 9, 29, and 30, 2013, a requirement that Grounds reiterated to Ryder on June 18, 2013. (Exhibit 17, June 14, 2013 Email; Exhibit 2, Ryder Dep. at 149:21-157:14, 191:22-192:11). On June 26, 2013, Ryder contacted Reed Group, at which point, Reed Group provided Ryder with the FMLA paperwork. (Exhibit 24, Reed Group Medical Records at 11, 20-31; Exhibit 2, Ryder Dep. at 197:17-198:6, 201:11-202:2, 203:13-204:14). In the FMLA paperwork, Reed Group, once again, asked Ryder to provide a medical certification form to support her intermittent leave from May 8, 2013 to November 8, 2013. (*Id*.). The FMLA paperwork advised Ryder that her FMLA leave may be denied if she failed to provide a timely, complete, and sufficient medical certification form—this consequence was also set forth in Shell's FMLA policy, all of which Ryder admitted she understood. (*Id*.; *see also* Exhibit 2, Ryder Dep. at 189:24-191:19, 209:20-210:4).

Despite being aware of the critical need to provide a medical certification form to support the absences on May 8, 9, 29, and 30, 2013, neither Ryder nor Dr. Beard provided any such support to Reed Group. (Exhibit 24, Reed Group Medical Records at 13-16). In fact, Dr. Beard indicated that there were no complications with Ryder's pregnancy, Ryder was able to perform

her job duties prior to delivery, and there was no medical necessity for Ryder to take any intermittent leave. (*Id.*; Exhibit 2, Ryder Dep. at 210:9-25, 211:22-214:1, 217:15-220:16).

Nonetheless, Reed Group contacted Ryder to obtain a medical certification form to support intermittent leave for the absences on May 8, 9, 29, and 30, 2013; however, Ryder never submitted any additional FMLA paperwork to Reed Group. (Exhibit 24, Reed Group Medical Records at 32-37; Exhibit 2, Ryder Dep. at 221:25-222:3). When Reed Group contacted Dr. Beard, Dr. Beard—consistent with her prior medical certification form in which she indicated that there were no complications with Ryder's pregnancy, Ryder was able to perform her job duties prior to delivery, and there was no medical necessity for Ryder to take intermittent leave prior to delivery—confirmed that she did not support any intermittent leave for the absences on May 8, 9, 29, and 30, 2013. (Exhibit 24, Reed Group Medical Records at 10 ). Ryder admitted that Dr. Beard did not provide support for any intermittent leave for the absences on May 8, 9, 29, and 30, 2013. (Exhibit 2, Ryder Dep. at 231:24-234:13). Ryder's failure to provide a medical certification form to support her absences on May 8, 9, 29, and 30, 2013 was sufficient grounds for Shell to deny FMLA leave.[12] *See Comeaux-Bisor*, 2007 WL 3171838, at *4-5 (granting summary judgment on plaintiff's interference claim when plaintiff failed to provide medical certification form for pregnancy-related illness because "the failure to provide an

---

[12]     Even though Shell denied FMLA protection for the absences on May 8, 9, 29, and 30, 2013, Ryder was never prevented from taking leave on those particular days—and, in fact, Ryder did take off from work on those days. *See Arismendiz v. University of Texas at El Paso*, 536 F. Supp. 2d 710, 716 (W.D. Tex. 2008) ("[A] plaintiff suffers no FMLA injury when she receives all the leave she requests.").

        Although Ryder disputes that Shell terminated her for her ongoing and documented history of performance problems, Ryder could not—and did not—deny the fact that Shell could have terminated her for all her performance problems during her employment with Shell. (Exhibit 2, Ryder Dep. at 244:11-245:12). Indeed, as discussed above in Section IV.G., Shell made the decision to terminate Ryder's employment well before she requested any FMLA leave for the absences on May 8, 9, 29, and 30, 2013—and, as such, her request for FMLA could not have played any factor in the decision to terminate her employment. Indeed, Ryder previously requested and took FMLA leave during her employment with Shell—and, in fact, admitted that Shell never prevented her for taking leave. (Exhibit 27, FMLA Leave January 2013; Exhibit 2, Ryder Dep. at 194:7-10).

- 16 -

appropriate medical certification is *fatal* to a claim under the FMLA") (citations omitted and emphasis added).

To the extent that Ryder claims that Shell's failure to approve certain absences as FMLA leave resulted in any injury to Ryder, the overwhelming and undisputed evidence clearly establishes that Ryder's ongoing and documented history of performance problems resulted in her termination—not her request for FMLA leave.  *See Beem v. Providence Health & Services*, No. CV-10-0037-JLQ, 2011 WL 4852301, at *13-14 (E.D. Wash. Oct. 13, 2011) ("A plaintiff requesting FMLA leave in the midst of disciplinary proceedings related to tardiness or absences does not prevent otherwise valid termination.").  Ryder has no competent summary judgment evidence to raise a material fact issue regarding the denial of her FMLA leave and, therefore, cannot establish her claim for interference under the FMLA.

**B.      Ryder's Breach of Contract Claim Fails as a Matter of Law**

Ryder alleges that Shell breached the terms and conditions of the Retention Agreement by unlawfully terminating her prior to the end of the Retention Agreement.  To prevail on her breach of contract claim, Ryder must establish:  (1) the existence of a contract or agreement; (2) breach of the contact or agreement by Shell; (3) causation; and (4) damages suffered by her as a result of the breach.  *White v. Aguirre, Inc.*, No. 05-00-00503-CV, 2002 WL 987930, *4 (Tex. App.—Dallas May 15, 2002, no pet.).  Ryder cannot establish the second prong of her breach of contract claim.

**1.      Ryder was an At-Will Employee and, as Such, Shell Could Terminate Her Employment for Any Reason**

There is no duty of good faith and fair dealing in the employment context under Texas law.  S*ee Constantine v. American Airlines Pension Benefit Plan*, 162 F.Supp. 2d 552, 558 (N.D. Tex. 2001); *see also City of Midland v. O'Bryant*, 18 S.W.3d 209, 216 (Tex. 2000) (refusing to

allow plaintiffs to bring a common-law cause of action for the same actions on which they based their employment discrimination and retaliation claims under the Texas Labor Code).   An employment relationship is at-will unless an employment contract limits in a "meaningful and special way" the employer's right to terminate the employee without cause.  *Massey v. Houston Baptist University*, 902 S.W.2d 81, 83 (Tex. App.—Houston [1st Dist.] 1995, writ denied).  The employer must unequivocally indicate its intent to be bound not to terminate the employee except under specified circumstances.  *Montgomery County Hosp. Dist. v. Brown*, 965 S.W.2d 501, 502 (Tex. 1998).   To be enforceable, an agreement to modify the at-will employment relationship must be express rather than implied and must be clear and specific.  *Id.*

If an employment contract allows termination for any reason or otherwise specifies that the employment relationship is at-will, then the employment contract is at-will as a matter of law.  *Morales v. Info. Referral Res. Assistance, Inc.*, No. 13-09-00290-CV, 2011 Tex. App. LEXIS 4059, at *4-11 (Tex. App.—Corpus Christi May 26, 2011, no pet.) (discussing that a contract containing an explicit at-will employment clause provided for at-will employment as a matter of law); *Curtis v. Ziff Energy Group, Ltd.*, 12 S.W.3d 114, 118 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (holding that a contract allowing either party to terminate employment for any reason constituted an at-will employment agreement as a matter of law); *Massey*, 902 S.W.2d at 83 (holding that written employment contract did not alter at-will employment relationship because contract contained no term limiting employer's ability to terminate employee at-will).

The Retention Agreement expressly created an at-will employment relationship between Ryder and Shell.  (Exhibit 5, Retention Agreement).  As indicated in the Retention Agreement, Ryder agreed that her "employment shall be at the will of the Company, in such capacity as the

- 18 -

Company may in its sole discretion determine" and that "the Company may in its sole discretion terminate [her] employment before, during, or subsequent to, the termination of this Agreement, with or without cause and with or without notice." (*Id.*). At her deposition, Ryder admitted that her employment relationship with Shell was at-will and that she could be terminated at any time:

```
Q.      . . . Do you see  . . . where it says your employment
        shall be at the will of the company and the company
        may, in its sole discretion, determine?
                        *     *     *
A.      The - yes, I see that.
                        *     *     *
Q.      Yes.  What do you think that means?
A.      That my employment is at the will of the company.
Q.      Okay.  And that Shell could terminate you at any time.
        Correct?
A.      Yes.
```

(Exhibit 2, Ryder Dep. at 238:2-239:3) (objections omitted).

### 2. Ryder Failed to Meet Shell's Performance Expectations and, as Such, Forfeited her Retention Payment

The Retention Agreement expressly states that Ryder must be employed to receive the retention payment and that the retention payment shall be forfeited if, at any time during the retention period, Shell determined that Ryder failed to meet Shell's performance expectations. First, as Ryder herself admitted, she was not employed on July 31, 2013 to be eligible to receive the retention payment. (Exhibit 2, Ryder Dep. at 237:17-238:1). *See Wilson v. Noble Drilling Servs., Inc.*, No. 10-20129, 2010 WL 5298018, at *5 (5th Cir. Dec. 23, 2010) (discussing that plaintiff was not entitled to receive bonus when agreement expressly stated that he must be employed on the day bonus was distributed and he was terminated five days prior to bonus payment).

Second, Ryder understood that, if Shell determined that she failed to meet performance expectations, then she would forfeit the retention payment. (Exhibit 2, Ryder Dep. at 240:21-241:20). Ryder agreed that, if any employee is placed on a PIP, then the employee has failed to

meet performance expectations—indeed, Ryder admitted that she was placed on a PIP.  (Exhibit 2, Ryder Dep. at 241:22-242:4).  Ryder agreed that, if an employee is issued a written warning, then the employee has failed to meet performance expectations—indeed, Ryder admitted that she was issued a written warning while on a PIP.  (*Id*. at 242:5-9).  Ryder agreed that, if an employee violates company policies and procedures, then the employee has failed to meet performance expectations—indeed, Ryder admitted that she violated Shell's policies and procedures.  (*Id*. at 242:10-14).  Ryder's ongoing and documented history of performance problems—despite repeated opportunities to improve her performance—show that Ryder failed to meet Shell's performance expectations.  There is no doubt that Shell did exactly what it had a right to do under the Retention Agreement—not pay Ryder if she failed to meet Shell's performance expectations during the term of the Retention Agreement.  *See Garcia v. Corpus Christi Independent Sch. Dist*., 866 F. Supp. 2d 646, 660 (S.D. Tex. 2011) (noting that a party "is not liable for damages in doing what [it] has a right to do under the contract, for [it] can breach no duty in such a case").  Ryder has no competent summary judgment evidence to raise a material fact issue regarding Shell's reason for not paying her the retention payment and, therefore, cannot establish her breach of contract claim.

## VI.    CONCLUSION

For all of these reasons, Shell respectfully requests that the Court grant its Motion for Complete Summary Judgment and enter an Order dismissing this lawsuit in its entirety with prejudice to refiling, that Shell have judgment that Ryder take nothing from Shell, and that Shell have judgment for its costs and attorneys' fees, and for such other and further relief, at law or in equity, to which it is justly entitled.

Respectfully submitted,

REED SMITH LLP

By:    /s/ Fazila Issa
       **Fazila Issa**
       Texas Bar No. 24046136
       Federal ID No. 566478
       811 Main Street, Suite 1700
       Houston, Texas 77002
       (713) 469-3800 – Telephone
       (713) 469-3899 – Facsimile
       fissa@reedsmith.com

       Attorneys for Defendants

**Of Counsel:**

**Mark Temple**
State Bar No. 00794727
**Nikki D. Kessling**
State Bar No. 24070051
REED SMITH LLP
811 Main Street, Suite 1700
Houston, Texas 77002
(713) 469-3800-Telephone
(713) 469-3899-Facsimile
mtemple@reedsmith.com
nkessling@reedsmith.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on February 13, 2015, a true and correct copy of the foregoing document was served via the Court's Electronic Case Filing System on all counsel of record:

Nasim Ahmad

Delana Cline

CLINE | AHMAD

21 Waterway, Suite 300

The Woodlands, Texas 77380

Attorneys for Plaintiff

*/s/ Fazila Issa*

Fazila Issa