UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| NICOLE L. RYDER, § | |
| § | |
| Plaintiff, § | |
| vs. § | CIVIL ACTION NO. 4:14-cv-00726 |
| § | |
| SHELL OIL COMPANY, *et al.*, § | |
| § | |
| Defendants. § | |

## MEMORANDUM OPINION AND ORDER

### I.   INTRODUCTION

Pending before the Court is the defendants,' Shell Oil Company and Shell Exploration & Production Company ("Shell"), motion for summary judgment (Dkt. No. 12).  The plaintiff, Nicole L. Ryder ("Ryder"), has filed a response in opposition to the motion (Dkt. No. 28) and Shell has filed a reply (Dkt. No. 31).  After having carefully considered the motion, response, reply, the record and the applicable law, the Court determines that Shell's motion for summary judgment should be **GRANTED**.

### II.   FACTUAL OVERVIEW

This is an employment case in which Ryder, a former employee, alleges that Shell interfered with her ability to take leave in violation of the Family and Medical Leave Act ("FMLA") and breached terms and conditions of the Restricted Cash Agreement to Serve by prematurely terminating her employment.  On June 16, 2008, Ryder began employment with Shell as a Land Analyst.[1]  Ryder worked as a Land Analyst until she transferred to a land representative position on January 1, 2010.  Shell's New Hire Onboarding Handbook-US ("New Hire Handbook") sets forth the terms and conditions of employment for Shell employees.  (*See*

---

[1] Ryder previously interned with Shell during the summer of 2007.

Dkt. No. 12, Ex. 3). Ryder acknowledged receiving a copy of the New Hire Handbook, which set forth, *inter alia*, Shell's performance expectations for employees such as Ryder. Performance expectations included: (1) reporting to work on time; (2) requesting vacation in advance; (3) producing a quality work product; and (4) providing notice to one's supervisor if he/she were to be tardy or absent from work due to an illness. (*Id.*). Ryder acknowledged that failing to comply with Shell's performance expectations would violate Shell's policies and procedures and could result in discipline and/or termination. (Dkt. No. 12, Ex. 2, Ryder Depo. at 24:4 – 12, 26:18 – 24, 27:12 – 17).

On August 1, 2011, Ryder and Shell entered into the Restricted Cash Agreement to Serve (the "Retention Agreement"). (Dkt. No. 12, Ex. 5). Pursuant to the terms of the Retention Agreement, in exchange for a cash payment in the amount of $60,300, Ryder agreed to remain employed at Shell until July 31, 2013, the end of the retention period. (*Id.*)

On January 1, 2012, Ryder transferred to a contracts representative position, with Dawn Suggs ("Suggs") as her immediate supervisor. (Dkt. No. 12, Ex. 2, Ryder Depo. at 15:22 – 24, 33:9 – 34:16). During this time, Ryder was repeatedly counseled by Suggs for various performance deficiencies, including increased absenteeism and tardiness. (*Id.*, Ex. 4, Suggs. Declar. ¶¶ 4 & 5; *see also* Ex. 2, Ryder Depo.). Based on these and other issues, Ryder received an overall performance rating of 0.7 for her year-end performance evaluation for 2012. (*Id.*, Ex. 4, Suggs. Declar. ¶ 6). Suggs met with Ryder to discuss her performance evaluation and to delineate areas of focus for the upcoming year. (*Id.*; *see also* Goals and Performance Appraisal Report at 11 – 12). Thereafter, on January 31, 2013, Ryder was placed on a performance

improvement plan ("PIP").[2]  (*See* Ex. 12, PIP; Ex. 2, Ryder Depo. at 114:2 - 10, 115:5 - 10, 116:2 - 8; Ex. 4, Suggs Declar. ¶ 7).

In spite of being placed on a PIP, Ryder failed to comply with Shell's performance expectations. On April 1, 2013, for example, Ryder emailed Suggs and informed her that she intended to take a vacation day that morning so that she could "pick up the dogs from the vet and take [her] brother to the airport." (*See* Ex. 14; Ex. 2, Ryder Depo. at 125:3 – 18). Although Ryder assured Suggs that she would "be in [the office] before [the] PHA meeting beg[an] so that [she would not] miss anything scheduled," she never showed up for work, missed the scheduled meeting, and never updated Suggs regarding her absence. (*See* Ex. 14; Ex. 15; Ex. 2, Ryder Depo. at 125:19 - 127:15). Suggs documented Ryder's unscheduled vacation day as a written warning. (*See* Ex. 15; Ex. 2, Ryder Depo. at 133:2 – 7; Ex. 4, Suggs Declar. ¶ 8). Suggs noted that the written warning would remain in effect for eighteen months and that "[a]ny further incidents of job-related problems could result in further formal corrective action possibly up to and including the termination of [her] employment." (*Id*.). She further suggested that Ryder's PIP be extended from April 30, 2013 to May 31, 2013. (*See* Ex. 16; *see also* Ex. 4, Suggs Declar. ¶ 8).

On May 28, 2013, Suggs contacted Jennifer Grounds ("Grounds"), Shell's HR Account Manager to discuss the status of Ryder's PIP and the next steps in light of Ryder's continued failure to enhance her performance. (*See* Ex. 22; Ex. 4, Suggs Declar. ¶ 9). Suggs met with Grounds on May 30, 2013, and outlined Ryder's performance problems. (Ex. 22; Ex. 4, Suggs Declar. ¶ 9). The final meeting to inform Ryder of the outcome of the PIP was initially

---

[2] Ryder stated that she did not agree with Sugg's comments related to her performance or with the PIP. (*See* Ex. 2, Ryder Depo. at 113:16 – 25, 115:1 - 4).

scheduled for June 12, 2013, but eventually took place on July 8, 2013. (*See* Ex. 4, Suggs Declar. ¶ 9).

In the Spring of 2013, Ryder became aware that she was expecting her first child. As a result of her pregnancy, she began experiencing severe morning sickness. (Dkt. No. 12, Ex. 17; Dkt. No. 28, Ex. 1-C). Ryder reported to her first neonatal appointment with Dr. Lisa Beard on May 30, 2013. (*See* Dkt. No. 13, Ex. 24). On June 13, 2013, Ryder first informed Grounds of her pregnancy and asked that she not inform Suggs. (Dkt. No. 12, Ex. 17; Ex. 2, Ryder Depo. at 149:21 - 157:14, 191:22 - 192:11). On June 14, 2013, Grounds, after congratulating Ryder on her good news, asked her to provide a medical certification form to support her absences on May 8, 9, 29, and 30, 2013--a requirement that Grounds reiterated to her on June 18, 2013. (*Id.*, Ex. 17; Ex. 2, Ryder Depo. at 149:21 - 157:14, 191:22 - 192:11).

On June 26, 2013, Ryder contacted the Reed Group, Shell's third-party leave administrator, to initiate her request for FMLA leave and to request that the appropriate paperwork be sent to her via e-mail. (Dkt. No. 13, Ex. 24, Reed Grp. Med. Rec. at 11, 20 - 31; Dkt. No. 12, Ex. 2, Ryder Depo. at 197:17 - 198:6, 201:11 - 202:2, 203:13 - 204:14). The Reed Group provided Ryder with the appropriate FMLA paperwork. (Dkt. No. 13. Ex. 24, Reed Grp. Med. Rec. at 11, 20 - 31; Dkt. No. 12, Ex. 2, Ryder Dep. at 197:17 - 198:6, 201:11 - 202:2, 203:13 - 204:14). In the FMLA paperwork, Ryder was advised to provide a medical certification form to support her intermittent leave from May 8, 2013 to November 8, 2013, within fifteen calendar days of receiving the information packet. (*Id.*). The FMLA paperwork also informed Ryder that her FMLA leave may be delayed or denied if she failed to provide a timely and complete medical certification form—this requirement was also set forth in Shell's FMLA

policy,[3] all of which Ryder admitted she appreciated. (Dkt. No. 13, Ex. 24; *see also* Dkt. No. 12, Ex. 23, Ex. 2, Ryder Depo. at 189:24 - 191:19, 209:20 - 210:4).

Nonetheless, neither Ryder nor Dr. Beard provided the appropriate documentation to the Reed Group to support her absences on May 8, 9, 29, and 30, 2013. (Dkt. No. 13, Ex. 24, Reed Grp. Med. Rec. at 13 - 16). In fact, Dr. Beard indicated on the medical certification form provided that there were no complications with Ryder's pregnancy, Ryder was medically capable of performing her job duties prior to delivery, and no medical necessity existed for Ryder to take any intermittent leave prior to delivery. (*Id.*; Ex. 2, Ryder Depo. at 210:9 - 25, 211:22 - 214:1). Dr. Beard only supported continuous leave after Ryder's delivery from January 3, 2014 to February 17, 2014. When the Reed Group followed up with Dr. Beard's office, Dr. Beard, via her staff representative, confirmed that she only supported FMLA leave following Ryder's delivery. (Dkt. No. 13, Ex. 24, Reed Grp. Med. Rec. at 10.).

On July 8, 2013, Kent Abadie, Sugg's manager, Suggs, Ryder's immediate supervisor, and Christine Layne, Shell's HR Account Manager who attended the meeting on behalf of Grounds, met with Ryder and informed her of her termination due to her continued failure to meet Shell's performance expectations. (*See* Dkt. No. 12, Ex. 4).

On March 21, 2014, Ryder commenced the instant action against Shell alleging claims for FMLA interference and breach of contract.

---

[3] Shell's FMLA policy provides, in pertinent part, the following:

> Employees are required to submit complete and accurate medical certification to [Shell] (including [its] FMLA management vendor) within fifteen (15) calendar days of either the date the documents were sent to the employee or the date of the leave, whichever is greater. Failure to return the documentation as required may result in the denial of FMLA coverage.

(Dkt. No. 12, Ex. 23 at 3.).

## III.   SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure authorizes summary judgment against a party who fails to make a sufficient showing of the existence of an element essential to the party's case and on which that party bears the burden at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  The movant bears the initial burden of "informing the district court of the basis for its motion" and identifying those portions of the record "which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323; *see also Martinez v. Schlumber, Ltd.*, 338 F.3d 407, 411 (5th Cir. 2003).  Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

If the movant meets its burden, the burden then shifts to the nonmovant to "go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial."  *Stults v. Conoco, Inc.*, 76 F.3d 651, 656 (5th Cir. 1996) (citing *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995); *Little*, 37 F.3d at 1075).  "To meet this burden, the nonmovant must 'identify specific evidence in the record and articulate the 'precise manner' in which that evidence support[s] [its] claim[s].'"  *Stults*, 76 F.3d at 656 (citing *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir.), *cert. denied*, 513 U.S. 871, 115 S. Ct. 195, 130 L. Ed.2d 127 (1994)).  It may not satisfy its burden "with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."  *Little*, 37 F.3d at 1075 (internal quotation marks and citations omitted).  Instead, it "must set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case."

*Am. Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Intern.*, 343 F.3d 401, 405 (5th Cir. 2003) (citing *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)).

"A fact is material only if its resolution would affect the outcome of the action, . . . and an issue is genuine only 'if the evidence is sufficient for a reasonable jury to return a verdict for the [nonmovant].'" *Wiley v. State Farm Fire and Cas. Co.*, 585 F.3d 206, 210 (5th Cir. 2009) (internal citations omitted). When determining whether a genuine issue of material fact has been established, a reviewing court is required to construe "all facts and inferences . . . in the light most favorable to the [nonmovant]." *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005) (citing *Armstrong v. Am. Home Shield Corp.*, 333 F.3d 566, 568 (5th Cir. 2003)). Likewise, all "factual controversies [are to be resolved] in favor of the [nonmovant], but only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Boudreaux*, 402 F.3d at 540 (citing *Little*, 37 F.3d at 1075 (emphasis omitted)). Nonetheless, a reviewing court is not permitted to "weigh the evidence or evaluate the credibility of witnesses." *Boudreaux*, 402 F.3d at 540 (quoting *Morris*, 144 F.3d at 380). Thus, "[t]he appropriate inquiry [on summary judgment] is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Septimus v. Univ. of Hous.*, 399 F.3d 601, 609 (5th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 – 52 (1986)).

## IV.   ANALYSIS AND DISCUSSION

### A.   The Plaintiff's Claim of FMLA Interference

Ryder asserts that Shell interfered with her FMLA rights when it denied her request for leave for her absences on May 8, 9, 29 and 30, 2013. The FMLA "requires a covered employer to allow an eligible employee up to twelve weeks of unpaid leave if the employee suffers from 'a

serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 763 (5th Cir. 2001) (quoting 29 U.S.C. § 2601(a)(1)(D)). It also "prohibits employers from 'interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise, any right provided under' the Act." *Paris v. Sanderson Farms, Inc.*, No. 13-20239, 542 Fed. Appx. 370, 378 (5th Cir. 2013) (quoting 29 U.S.C. § 2615(a)(1)).

In order "[t]o demonstrate that [Shell] interfered with her rights under the FMLA, . . . [Ryder] must show that (1) she is an eligible employee under the FMLA, (2) [Shell] is an employer subject to FMLA requirements, (3) she was entitled to FMLA leave, (4) she gave notice to [Shell] of her intention to take FMLA leave, and (5) [Shell] denied the FMLA leave to which she was entitled." *Comeaux-Bisor v. YMCA of Greater Houston*, Civil Action No. H-06-2836, 2007 WL 3171838, *4 (S.D. Tex. Oct. 26, 2007) (other citations omitted).

"To establish eligibility for FMLA leave, [a] [p]laintiff must adduce evidence showing that she suffered a serious health condition that made her unable to perform the functions of her job." *Schimek v. MCI, Inc.*, No. 3:05-CV-0045-P, 2006 WL 2252034, *11 (N.D. Tex. Aug. 7, 2006) (citing *Mauder v. Metro. Transit Auth. of Harris Cty., Tex.*, 446 F.3d 574, 579 (5th Cir. 2006); 29 U.S.C. § 2612(a)(1)(D) (2002)). The FMLA provides that an employer may require that a FMLA leave request be supported by a certification form issued by a health care provider or an employee's treating physician. *See Hurt v. Ecolab, Inc.*, No. 3:05-CV-1508-BD, 2006 WL 1409520, at *4 (N.D. Tex. May 23, 2006) (citing 29 U.S.C. § 2613(a)). "The failure to provide an appropriate medical certification or recertification is fatal to a claim under the FMLA" in such cases. *Hurt*, 2006 WL 1409520, at *4 (citing 29 C.F.R. § 825.311) (other citations omitted).

On June 14, 2013, Grounds asked Ryder to provide a medical certification form to support her absences on May 8, 9, 29, and 30, 2013, a requirement that Grounds reiterated to her on June 18, 2013.  (*See* Ex. 17, June 14, 2013 Email; Ex. 2, Ryder Dep. at 149:21 - 157:14, 191:22 -192:11).  On June 26, 2013, Ryder contacted the Reed Group, Shell's third-party leave administrator, to initiate her request for FMLA leave and to request that the appropriate paperwork be sent to her via e-mail. (Dkt. No.13, Ex. 24, Reed Grp. Med. Rec. at 11, 20-31; *see also* Dkt. No. 12, Ex. 2, Ryder Dep. at 197:17 - 198:6, 201:11 - 202:2, 203:13 - 204:14).  The Reed Group provided Ryder with the appropriate FMLA paperwork.  (Dkt. No. 13. Ex. 24, Reed Grp. Med. Rec. at 11, 20 - 31; Dkt. No. 12, Ex. 2, Ryder Dep. at 197:17 - 198:6, 201:11 - 202:2, 203:13 - 204:14).  The FMLA paperwork notified Ryder that she would need to provide a medical certification form to support her intermittent leave from May 8, 2013 to November 8, 2013, within fifteen calendar days of receiving the information packet.  (*Id*.).  The FMLA paperwork also informed Ryder that her FMLA leave may be delayed or denied if she failed to provide a timely and complete medical certification form—this requirement was also set forth in Shell's FMLA policy, all of which Ryder admitted she appreciated.  (*Id*.; *see also* Ex. 2, Ryder Dep. at 189:24-191:19, 209:20-210:4).

Neither Ryder nor her treating physician, however, provided the appropriate documentation to the Reed Group to support her absences taken on May 8, 9, 29, and 30, 2013.  (Dkt. No. 13, Ex. 24, Reed Grp. Med. Rec. at 13 - 16).  In fact, Dr. Beard indicated that there were no complications with Ryder's pregnancy, Ryder was medically capable of performing her job duties prior to delivery, and no medical necessity existed for Ryder to take intermittent leave prior to her delivery.  (Dkt. No. 12; Ex. 2, Ryder Dep. at 210:9 - 25, 211:22 - 214:1, 217:15 - 220:16).  Moreover, when the Reed Group followed up with Dr. Beard's office concerning

Ryder's FMLA request, Dr. Beard, via a staff representative, confirmed that she only supported FMLA leave following Ryder's delivery. (Dkt. No. 13, Ex. 24, Reed Grp. Med. Rec. at 10.). Given Ryder's failure to provide supporting medical certification, Shell's denial of her request for FMLA leave for May 8, 9, 29 and 30th was warranted.

In an attempt to demonstrate her entitlement to FMLA leave for May 8, 9, 29 and 30th or, to at least raise a genuine issue of material fact for trial, Ryder relies on the transcript of a call between the Reed Group and Dr. Beard's office. (*See* Dkt. No. 28, Ex. C-1). The transcript of the recorded conversation, however, does not indicate that Ryder's treating physician or anyone from his office stated that Ryder could not perform the functions of her position—an essential requirement of 29 U.S.C. §2613(b)---or that a medical certification form supporting her absences on May 8, 9, 29 and 30th would issue.[4] *Hurt*, 2006 WL 1409520, at *4 (citing *Kinchelow v. Robinson Prop. Grp.*, No. 2-97-CV047-B, 1998 WL 180316 at *2 (N.D. Miss. Mar. 27, 1998) ("To state that the employee should be excused from work is not the same thing as saying that the employee cannot perform the functions of her job.")). Ryder's reliance on *Pendarvis v. Xerox Corp.*, 3 F. Supp.2d 53 (D.D.C. 1998) and *Atchley v. The Nordam Group, Inc.*, 180 F.3d 1143 (11th Cir. 1999), as support for her position that severe morning sickness automatically

---

[4]The plaintiff makes much ado about the fact that Shell did not appropriately notify her of any deficiencies in the medical certification form submitted by Dr. Beard on her behalf on June 27, 2013. The record, however, establishes otherwise. The record indicates that on June 28, 2013, the Reed Group sent a letter to Ryder: (1) notifying her that the medical certification form submitted on her behalf did not contain all of the information necessary to support her request for FMLA intermittent leave; (2) specifically identifying the deficient areas noted on the form; and (3) enclosing an additional FMLA certification form for completion by her and/or her treating physician. It is undisputed that Ryder never supplied any further information or certification to the Reed Group and/or Shell documenting her entitlement to FMLA leave for her absences on May 8, 9, 29 and 30, 2013.

entitles a pregnant employee to FMLA leave in spite of an employer's medical certification request is also misplaced.[5]

Further, in light of Ryder's history of performance deficiencies, including her excessive tardiness, absenteeism, and Shell's many documented attempts to assist her in improving her performance, this Court is convinced that Shell's decision to deny Ryder's request for FMLA leave was warranted. After all, appropriate documentation was never provided. Moreover, the evidence fails to establish that Ryder "suffered a serious health condition that made her unable to perform the functions of her job" on the days that she was absent. Because Ryder's absences do not qualify as FMLA leave, they are unexcused absences. Simply put, Ryder fails to show that she was an eligible employee entitled to FMLA leave in May, 2013. Therefore, Shell is entitled to a summary judgment on Ryder's FMLA interference claim. *See Comeaux-Bisor*, 2007 WL 3171838 at *4 (granting summary judgment for employer on plaintiff employee's FMLA interference claim where employee failed to provide medical certification form documenting a "serious health condition" during her pregnancy that would entitle her to FMLA leave); *see also Richardson v. Monitronics Intern., Inc.*, 434 F.3d 327, 336 (5th Cir. 2005) (finding that an employer was entitled to a summary judgment on a FMLA retaliation claim where the employer established that the employee had more than enough unexcused absences to justify termination under the company's attendance policy).

    **B.**    **The Plaintiff's Breach of Contract Claim**

Ryder also contends that Shell unlawfully breached the Retention Agreement by failing to pay her the retention bonus due under the parties' Agreement. To recover on a breach of

---

[5]Ryder cites to *Pendarvis* and *Atchley* as support for her position that a pregnant employee is automatically entitled to FMLA leave where the employee claims to have severe morning sickness, regardless of whether her employer has requested that a medical certification be provided relative to such morning sickness. Neither of these cases, however, supports such a conclusion. *See Pendarvis*, 3 F. Supp.2d at 55 – 56; *Atchley*, 180 F.3d at 1150.

contract claim under Texas law, the plaintiff must establish: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 418 (5th Cir. 2009) (quoting *Aguiar v. Segal*, 167 S.W.3d 443, 450 (Tex. App.-Houston [14th Dist.] 2005, pet. denied)).

In this case, the issue of "whether a contract is ambiguous is a question of law." *Addicks Servs., Inc. v. GGP-Bridgeland, LP*, 596 F.3d 286, 294 (5th Cir. 2010). "A contract is unambiguous if it can be given a definite or certain legal meaning." *Id.* (internal citations omitted). "A contract is ambiguous, on the other hand, 'if its plain language is amenable to more than one reasonable interpretation.'" *Horn v. State Farm Lloyds*, 703 F.3d 735, 738 (5th Cir. 2012) (quoting *Nautilus Ins. Co. v. Country Oaks Apts., Ltd.*, 566 F.3d 452, 455 (5th Cir. 2009)). When interpreting a written contract, "[t]he court's primary concern is to enforce the parties' intent as contractually expressed, and an unambiguous contract will be enforced as written." *Interstate Contracting Corp. v. City of Dallas*, 407 F.3d 708, 712 (5th Cir. 2005). The Court now examines the language of the Retention Agreement with the same principles in mind.

Ryder does not argue that the Retention Agreement is ambiguous, but rather that she is entitled to receive payment under the Retention Agreement because she is entitled to FMLA protection for the absences alleged and, as such, Shell is precluded from relying on those absences in terminating her employment and denying her the retention payment. This Court does not agree.

The Retention Agreement specifically provides, in pertinent part, as follows: (1) "[a] Restricted Cash Payment ("Payment") of $60,300 will be made within 15 business days from the end of the Retention Period, [August 1, 2011 through July 31, 2013,] subject to the terms and

conditions of this Agreement, including any applicable adjustment, forfeiture and adjusted time of payment provisions"; (2) as a prerequisite to receiving any payment under the Retention Agreement, Ryder must "remain an employee of [Shell] throughout the Retention Period; (3) "[Ryder's] employment shall be at the will of [Shell], in such capacity as [it] may in its sole discretion determine. The Payment may be affected by a change in [her] duties or position as set forth [in the Retention Agreement]"; and (4) "any unpaid amount of the Payment under [the Retention] Agreement shall be forfeited if during the Retention Period [Shell] concludes that (i) [she] failed to meet performance expectations in [her] assignments and responsibilities." (Dkt. No. 12, Ex. 5).

Indeed, it is undisputed that Ryder was terminated by Shell on July 8, 2013, and thus, was not in Shell's employ on July 31, 2013, the last day of the Retention Period. More importantly, Ryder specifically acknowledged that she understood that if Shell determined that she failed to meet its performance expectations, the retention payment would be forfeited. (Dkt. No. 12, Ex. 2, Ryder Depo. at 240:21 – 241:20). Additionally, the record is replete with evidence of Ryder's performance deficiencies and continued failure to adhere to Shell's performance expectations as set forth in the PIP. In fact, based on Ryder's *own* admissions, she repeatedly failed to comply with Shell's policies and procedures *and* the PIP—all of which would warrant termination by Shell and forfeiture of the retention payment. (*Id.*, Ex. 2, Ryder Depo. at 242:20 - 245:11). Further, Ryder has adduced no competent summary judgment evidence sufficient to raise a genuine issue of material fact regarding Shell's stated reason for refusing to pay her under the Retention Agreement. Accordingly, Shell is entitled to a summary judgment on Ryder's breach of contract claim.

V. **CONCLUSION**

    Based on the foregoing analysis and discussion, Shell's motion for summary judgment is **GRANTED**.

    It is so **ORDERED**.

    SIGNED on this 14th day of September, 2015.

                                             Kenneth M. Hoyt
                                             United States District Judge